IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RODNEY GILLESPIE, et al., | |
| Plaintiff, | CIVIL ACTION |
| v. | NO. 20-4948 |
| PENNSYLVANIA STATE POLICE, et al., | |
| Defendant. | |

## OPINION

Slomsky, J.                                                December 3, 2021

### TABLE OF CONTENTS

I.    INTRODUCTION ………………………………………..…………………….…….…1

II.   BACKGROUND………………..…………….……………………………………….……...2

    A.  The Traffic Stop………………………………………………………….…….........2

    B.  Events After the Stop……………..……………………………………….……5

    C.  Defendants' Motion to Dismiss………………………………………….…….7

    D.  Plaintiffs' Supplemental Briefing on the Dashcam Footage……………..……………8

III.  STANDARD OF REVIEW …………………………………………..………..…9

IV.   ANALYSIS …………………………………………………..………………………....11

    A.  All claims against Defendants Commonwealth of Pennsylvania
       and Pennsylvania State Police will be dismissed pursuant to
       Eleventh Amendment Immunity………………………………...…………..…………11

    B.  Plaintiff cannot establish a claim for malicious prosecution
       because Mr. Gillespie was detained prior to the issuance of any charges ……………13

    C.  The Pennsylvania Equal Protection claim against all Defendants
       will be Dismissed because Plaintiffs did not produce any comparators …………..…15

D.  The Motion to Dismiss the negligent infliction of emotional
distress claim will be granted because Plaintiffs do not assert
any negligent action done by Trooper Johnson……………...…………….……….17

E.  The dashcam footage cannot be considered at the Motion to Dismiss stage………...18

F.  The Motion to Dismiss Count II of the Complaint for false
imprisonment will be converted into a Motion for Summary
Judgment because it relies on the dashcam recording………………………………….20

G.  The dashcam footage must be considered in order to determine
whether Trooper Johnson is entitled to qualified immunity …………….……………21

H.  The Motion to Dismiss the Intentional Infliction of Emotional
Distress claim will be converted into a Motion for Summary Judgment……………...23

I.  Whether Trooper Johnson is entitled to sovereign immunity
will be decided at the Summary Judgment stage. …………….………………..…....24

V.    **CONCLUSION**…..…………………………….……………………...………………..25

## I.    INTRODUCTION

This case involves the concerns of an African American family living in suburban America who come in contact with police officers.  Rodney Gillespie, Angela Gillespie, and Jaida Gillespie (collectively "Plaintiffs") allege that their Fourth Amendment rights were violated during a traffic stop in such a setting.  They claim that during and after the traffic stop, they were falsely imprisoned in violation of the Fourth Amendment to the United States Constitution.  (See Doc. No. 1 at 38—40.)  In addition, Plaintiff Rodney Gillespie asserts that he was subject to malicious prosecution, also in violation of the Fourth Amendment.  (Id. at 40-42.)  Violations of the Equal Protection Clause of the Pennsylvania State Constitution, as well as the intentional and negligent infliction of emotional distress, are also alleged by them.

Plaintiffs commenced this action on October 7, 2020.  (Doc. No. 1.)  Named as Defendants are the Commonwealth of Pennsylvania ("Defendant Commonwealth"), Pennsylvania State Police ("Defendant State Police"), and Defendant State Trooper Christopher S. Johnson ("Defendant Johnson"), who did the traffic stop.

On December 9, 2020, Defendants filed a Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  (See Doc. No. 2.)  On January 22, 2021, Plaintiffs filed a response.  (See Doc. No. 6)  On February 12, 2021, Defendants filed a reply.  (See Doc. No. 9.)   Supplemental briefing regarding the authenticity of the dashcam footage from Trooper Johnson's vehicle was also filed (Doc. No. 16) and Defendants' filed a reply.  (Doc. No. 17.)  A hearing on the Motion to Dismiss was held on April 29, 2021.  (See Doc. No. 21.)  Supplemental briefing, as requested by the Court, on the Pennsylvania Equal Protection claim were filed by both parties.  (See Doc. Nos. 22, 23.)  For reasons set forth below, Defendants' Motion to Dismiss (Doc. No. 2) will be granted in part. The

Motion to Dismiss the claims that remain will be converted into a Motion for Summary Judgment under Federal Rule of Civil Procedure 12(d).

## II.   BACKGROUND

### A.  The Traffic Stop

On or about July 8, 2019, between 12:30 a.m. and 1:00 a.m., Plaintiffs were stopped by Trooper Johnson while driving home to Chadds Ford, Pennsylvania after visiting relatives in Lambertville, New Jersey.  (Doc. No. 1 at 7.)  Rodney Gillespie was driving the car, a sports utility vehicle (SUV).  His wife, Angela Gillespie ("Mrs. Gillespie"), was in the front passenger's seat and their seventeen-year old daughter, Jaida, was in a back seat.  (Id. at 7-8.)  Plaintiffs had just returned to the United States after a six-year hiatus due to Mr. Gillespie's job with AstraZeneca in South Africa.[1]  (Id. at 8.)  The SUV was a rental car, a 2019 Jeep Grand Cherokee.  (Id.)  Plaintiffs are African American.  (Id. at 5.)

Initially, Defendant Johnson, driving a marked police vehicle, began to follow the SUV on Route 1 South in Chadds Ford, Pennsylvania.  (Id. at 11.)[2]  Plaintiff made a right turn on Route 1 South onto Webb Road.  (Id. at 8.)  Webb Road is a dark, unlit, two-lane road with barely any shoulder.[3]  (Id.)  While driving on Webb Road, Johnson observed Plaintiffs' SUV cross the double

---

[1]   At the time of the incident, Mr. Gillespie was President of an Astra-Zeneca division in South Africa.  (Doc. No. 1 at 6.)

[2]   Trooper Voetelink, who accompanied Johnson, stated that before the traffic stop they saw Plaintiffs pass them on Harvey Road.  (Id. at 12.)  Harvey Road intersects with Route 1 approximately a mile from the location where Route 1 intersects with Webb Road and approximately 1.6 miles from Plaintiffs' home.  (Doc. No. 1 at 11.)

[3]   Street   View   for   681   Webb   Road,   Chadds   Ford,   PA.,   Google Maps, http://maps.google.com(search destination field for "681 Webb Road, Chadds Ford, PA" and navigate to "Photos").

yellow line.[4]  (Id. at 14.)  Johnson then attempted to initiate a traffic stop by turning on his lights and siren, but Plaintiffs continued driving, turning onto Atwater Road.  (Id. at 8.)  Atwater Road is not lit and does not have a shoulder.[5]  (Id.)  Mr. Gillespie did not increase the SUV's speed after hearing the commands from Johnson's vehicle.  (Id.)  Plaintiffs traveled for about forty-nine seconds before coming to a stop in the driveway of their home on Atwater Road.  (Id.)

After stopping, Mr. Gillespie turned off the SUV, rolled down the windows, and placed his hands on the steering wheel.[6]  (Id.)  Johnson and a fellow State Trooper, Voetelink, approached the car and yelled "Get out of the car! State Police! Get out of the car!"  (Id. at 9.)  The Troopers then asked Mr. Gillespie why he did not immediately pull over.  (Id.)  Gillespie responded that he had stopped at his own house and "[t]his is a small street. I didn't want to get killed man."  Johnson asked Gillespie how old he was and told him to turn the car off.  (Id.)  Gillespie then said, "Ya'll kill Black people, I don't want to get killed," to which Trooper Johnson responded, "knock off that nonsense."[7]  (Id.)  Trooper Johnson then yelled "Do you know how to get hurt?  By not stopping!" and ordered him out of the car.  (See Dashcam Footage at 2:34.)

---

[4]  Plaintiffs state in the Complaint that they were informed of this crossing approximately fourteen minutes into the stop.  (Doc. No. 1 at 18.)  In the Complaint, Plaintiffs describe the crossing over the double yellow line as follows:  Defendant Johnson informed Mr. Gillespie that the purported reason for the Stop was because the SUV failed to maintain its lane and "was on top of the double yellow lines."  (Id.)

[5]  Street   View   for   3   Atwater   Road,   Chadds   Ford,   PA.,   Google Maps, http://maps.google.com(search destination field for "3 Atwater Road, Chadds Ford, PA" and navigate to "Photos").

[6]  Mr. Gillespie placed his hands on the steering wheel in an "open and obvious position" so that the Troopers could see them.  (Doc. No. 1 at 8.)

[7]  The Complaint alleges that Defendant Johnson also told Mr. Gillespie, "Listen, one of my best friends, that's a trooper that works with me, is black. I don't want to hear that black nonsense." (Doc. No. 1 at 11.)

Thereafter, Defendant Johnson asked Mr. Gillespie more questions, such as "do you have any weapons on you?" and "what do you think it means when you're not stopping for me?" Gillespie replied by saying that he did not stop initially because he was concerned for his family's safety. (Doc. No. 1 at 9.)

After ordering him out of the SUV, Trooper Johnson told Mr. Gillespie to put his hands behind his back and frisked him for weapons. (Id. at 10.) No weapons were found. (Id.) Gillespie was then informed that he was the subject of an "official police investigation" and was being "detained," at which point he was handcuffed for more than seven minutes. (Id. at 10-11.)

During this time, Trooper Voetelink began to question Mrs. Gillespie, who was still in the passenger's seat. (Id. at 11.) Mrs. Gillespie explained that she was Mr. Gillespie's wife and the house they were stopped at was their home. (Id.) Trooper Voetelink next informed Mr. Gillespie that break-ins have been occurring involving people driving and then parking on dark secluded roads. (Id. at 14.) He told Mr. Gillespie that, just the night before, he and Trooper Johnson were involved in a car chase. (Id. at 14.) Voetelink then said to Mr. Gillespie, "Who's in your car? Your girlfriends?," referring to Mrs. Gillespie and their daughter, Jaida. (Id.) During this time, two unidentified back-up Troopers arrived at the scene and a third was waived away.[8] (Id. at 15.)

The back-up troopers began to question Mrs. Gillespie and again asked if the house belonged to them. (Id. at 16.) As one of the back-up troopers explained to her: 1) there had been an uptick in burglaries in the area, 2) cars were being stolen from dealerships, 3) there was a police chase the night before involving guns, and 4) perpetrators often used their "girlfriends" as

---

[8]   Plaintiffs note that one of the back-up Troopers was white and the other was black. (See Doc. No. 1 at 15).

accomplices.  (Id.)  Trooper Johnson then approached Mrs. Gillespie and asked her a series of questions:

1)  What's this address?
2)  Who owns this house?
3)  What's the deal with this being a mailing address on the driver's license?[9]
4)  You understand the issue of you guys not pulling over right?
5)  Have you ever lived in America before?

(Id. at 17.)  Further, one of the back-up troopers stated to her that crossing over the center line could be a sign of impairment.  (Id.)

The stop concluded with Defendant Johnson issuing two traffic citations to Mr. Gillespie: 1) "Driving on Roadways Laned for Traffic," in violation of 75 Pa. C.S.A. § 3309 and 2) "Duty of Driver on Approach of Emergency Vehicle," in violation of 75 C.S.A. § 3325 (collectively "the Citations").  Throughout the entire stop, Mr. and Mrs. Gillespie both repeatedly expressed their concern for their safety.  (See, e.g., id. at 18) ("Mrs. Gillespie again expressed her and her family's concerns for their safety…")

### B.  Events After the Stop

On July 16, 2019, Mr. Gillespie appeared in a Magisterial District Court to dispute the Citations. (Id. at 21.)  At the hearing, the representative of Defendant State Police dismissed the citation for Failure to Stop.  (Id.)  Mr. Gillespie then pleaded guilty to the charge involving the lane change.  (Id. at 22.)  He filed an appeal to the Court of Common Pleas.  (Id.)  On November 19, 2019, at the hearing on the appeal, no representative from the State Police appeared.  (Id.)  The Judge therefore reversed Mr. Gillespie's Driving Lane Change charge.  (Id.)  Around this time,

---

[9]    Mr. Gillespie's license had a P.O. Box listed as the address.  Mrs. Gillespie explained to Trooper Johnson that he used a P.O. Box because they were out of the country for the past 6 years.  (Doc. No. 1 at 17.)

news outlets were reporting that the Pennsylvania State Police stopped tracking race data for traffic stops.[10]  (Id.)

Mr. Gillespie filed a racial profiling complaint with the State Police on July 17, 2019.  (Id.) On July 31, 2019, Mr. and Mrs. Gillespie were interviewed about the stop by the State Police's Heritage Affairs Commander and two internal affairs officers.  (Id.)  These officials reviewed the investigative process with the Gillespies and showed them the dashcam footage of the traffic stop. (Id. at 22.)   And on September 20, 2019, the State Police published a News Release noting Mr. Gillespie's "bias-based profiling" complaint was not sustained, but the troopers (including Defendant Johnson) who conducted the stop violated two state police regulations:

1. Failure to activate personal microphones and
2. Failure to "more effectively deescalate the situation" upon making initial contact with Mr. Gillespie

(Id. at 23.)  Neither the News Release nor the results of the investigation were disclosed to Plaintiffs before being made available to the public.  (Id. at 25.)[11]   On September 23, 2019, Mr. Gillespie was provided with a copy of the investigation's results.  (Id. at 27.)

---

[10]   An article was published in the Pittsburgh Post-Gazette, which stated that not tracking this data made it more difficult to detect bias.  (Doc. No. 1 at 25-26.)  The article identified Pennsylvania State Police as one of "only 11 statewide law enforcement agencies in the U.S. that does not collect race data during stops … "  (Id.) (quoting Angela Couloumbis and Daniel Simmons-Ritchie, Pa. State Police stopped tracking the race of drivers who get pulled over, making bias must harder to detect, SPOTLIGHT PA (Sept. 20, 2019).  The State Police later confirmed that they would resume collecting race data for traffic stops again in 2020.  (Id.)

[11]   Plaintiffs contend that at a meeting of the Board of Supervisors of Chadds Ford, Pennsylvania, the Heritage Affairs Commander stated that the investigation into the traffic stop was nearly complete, but whether the results would be made public would be up to Plaintiffs.  (Doc. No. 1 at 24-25.) (See also Exhibit E) ("whether or not results of investigations are made public is normally the decision of the complainant.")

The instant Complaint was filed on October 7, 2020. Plaintiffs assert six different causes of action: 1) a violation of Title VI of the Civil Rights Act by all Plaintiffs against the Pennsylvania State Police (Count I);[12] 2) a false imprisonment claim under § 1983 by all Plaintiffs against Trooper Johnson (Count II); 3) a malicious prosecution claim under § 1983 by Rodney Gillespie against Johnson (Count III); 4) a claim by all Plaintiffs against all Defendants pursuant to the Equal Protection Clause of the Pennsylvania Constitution (Count IV); 5) a state law claim by all Plaintiffs against Trooper Johnson for intentional infliction of emotional distress (Count V); and 6) a state law claim by all Plaintiffs against all Defendants for negligent infliction of emotional distress (Count VI).

### C. Defendants' Motion to Dismiss

On December 9, 2020, Defendants filed a Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. (Doc. No. 2.) In the Motion, Defendants' make the following arguments: first, the six claims are facially insufficient to warrant relief, and second, qualified immunity and sovereign immunity bar both the Fourth Amendment and the state law claims, respectively. A hearing on the Motion to Dismiss was held on April 29, 2021. (See Doc. No. 21.) As noted above, at the hearing, the Court requested supplemental briefing on the sustainability of the claim involving the Equal

---

[12] Count I of the Complaint asserts a claim under Title VI of the Civil Rights Act of 1964 by all Plaintiffs against Defendant State Police. 42 U.S.C § 2000d et seq. See also Alexander v. Sandoval, 532 U.S. 275, 278 (2001). Section 601 of Title VI provides that no person shall "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI. Alexander, 532 U.S. at 278. Plaintiffs' did not address the Title VI claim in their Response to the Motion to Dismiss (Doc. No. 6) and their counsel withdrew this claim during the hearing on the Motion (Doc. No. 24 at 12). Therefore, it need not be addressed further in this Opinion and Defendants' Motion to Dismiss Count I will be granted.

Protection Clause of the Pennsylvania Constitution, which was later filed by both parties.  (Doc. Nos. 22, 23.)

### D.  Plaintiffs' Supplemental Briefing on the Dashcam Footage

Initially, the hearing on the Motion to Dismiss was scheduled for March 5, 2021.  (See Doc. No. 12.)  The day before the hearing, Plaintiffs sent a letter to the Court requesting extra time to file supplemental briefing on the authenticity of the dashcam footage that was attached to the Motion to Dismiss.  (See Doc. No. 13-1.)   On March 29, 2021, Plaintiffs submitted the expert report of Arlo E. West, a Certified Forensic Audio Expert.  (See Doc. No. 16-1.)  In his report, the expert contends that the dashcam video provided by the defense is not authentic. (Id.)  He opines that the footage provided by the Government is "a selectively edited version and a second generation copy."  (See id. at 10-11.)

In response, Defendants argue that the video is authentic and can be considered by the Court in deciding the Motion to Dismiss.  (See Doc. No. 17.)  In support of their position, they submitted an affidavit of Trooper Jean Altomari, who is a mobile video/audio recording (MVR) custodial officer.  (See id. at ¶¶ 2-3.)  Trooper Altomari created the DVD that was attached to the Motion to Dismiss.  (Id. at ¶ 13.)  She stated that the video is authentic and was kept in the same chain of custody as all other police dashcam videos.  (Id. at ¶¶ 11-12, 21-22.)

The Court initially set a hearing on the authenticity and verifiability[13] of the dashcam recording for November 15, 2021.   On November 9, 2021, a telephone conference was held by

---

[13]  By verifiability, the Court means compliance with the relevant requirements for admissibility of a video or audio recording as set forth in United States v. Starks, 515 F.2d 112, 121 n.11 (3d Cir. 1975).  They are:

> (1) That the recording device was capable of taking the conversation now offered in evidence.
> (2) That the operator of the device was competent to operate the device.

the Court with counsel for the parties.   During this conference, the Court noted that to engage in

such a hearing would involve matters outside the pleadings and therefore Rule 12(d) required that

the Motion to Dismiss by treated as a Motion for Summary Judgment.   During the conference,

defense counsel requested that the Court rule on the sufficiency of the claims that are unrelated to

the dashcam footage.   The Court has concluded it may do so.   See J.L. v. Harrison Tp. Bd. Of

Educ., 2014 WL 7331937 (D.N.J. 2014) (converting Count I and II in the complaint into a motion

for summary judgment and granting the motion to dismiss as to Count III).   For this reason, the

Court will rule on the sufficiency of the claims unrelated to the dashcam footage.   The Court will

then address the remaining counts that will be subject to the Motion for Summary Judgment.

## III.   STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure

to state a claim is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).   After Iqbal it is clear that

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.   Id. at 678; see also Bell

Atl. Corp. v. Twombly, 550 U.S. 544 (2007).   "To survive dismissal, 'a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"

Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678).

Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully."   Id.

(quoting Iqbal, 556 U.S. at 678).   Instead, "[a] claim has facial plausibility when the plaintiff pleads

---

(3) That the recording is authentic and correct.
(4) That changes, additions or deletions have not been made in the recording.
(5) That the recording had been preserved in a manner that is shown to the court.
(6) That the speakers are identified.
(7) That the conversation elicited was made voluntarily and in good faith, without any
    kind of inducement.

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 556 U.S. at 678).

Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Township, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679). The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

When determining whether a claim is plausible, a district court may also consider any affirmative defenses raised by the moving party.  "Technically, the Federal Rules of Civil Procedure require that affirmative defenses be pleaded in the answer." Robinson v. Johnson, 313 F.3d 128, 135 (3d Cir. 2002) (citing Fed. R. Civ. P. 12(b)).  However, the so-called "Third Circuit Rule" allows affirmative defenses to be raised in a 12(b)(6) motion. Id.; see also Ball v. Famiglio, 726 F.3d 448, 459 n.16 (3d Cir. 2013) cert. denied, 134 S. Ct. 1547 (U.S. 2014) ("[A] number of affirmative defenses that are not listed in Rule 12(b) [can] still be made by motion, provided that the basis of the defense [is] apparent on the face of the complaint."); Bethel v. Jendoco Const. Corp., 570 F.2d 1168, 1174 (3d Cir. 1978) ("[A]n affirmative defense may be raised on a 12(b)(6) motion if the predicate establishing the defense is apparent from the face of the complaint."). Qualified immunity is an affirmative defense and most importantly here, "qualified immunity may be raised in a motion to dismiss at the pleading stage." Eddy v. Virgin Islands Water & Power Auth., 256 F.3d 204, 210 n.3 (3d Cir. 2001).   From this, it follows that Eleventh Amendment and sovereign immunity are also affirmative defenses.

Further, Federal Rule of Civil Procedure 12(d) provides that "if, on a motion under Rule 12(b)(6) … , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  If a court does convert a motion to dismiss to a motion for summary judgment, it must give the parties "a reasonable opportunity to present all material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

## IV.    ANALYSIS

### A.  All claims against Defendants Commonwealth of Pennsylvania and Pennsylvania State Police will be dismissed pursuant to Eleventh Amendment Immunity.

Defendants Commonwealth of Pennsylvania and the Pennsylvania State Police assert that the all claims against them should be dismissed because they are entitled to immunity under the

Eleventh Amendment to the United States Constitution.[14]   (Doc. No. 2 at 29.)   The Eleventh Amendment provides: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."   U.S. Const. amend. XI.   Courts have interpreted the Amendment to make states immune from suit from private parties in federal court.   MCI Tele. Corp. v. Bell Atlantic, 271 F.3d 491, 503 (3d Cir. 2001) (citing cases).   The immunity extends to state agencies and departments, including the Pennsylvania State Police. Capogrosso v. Supreme Court of N.J., 588 F.3d 180, 185 (3d Cir. 2009).   There are three exceptions to Eleventh Amendment Immunity:  1) congressional abrogation, 2) state waiver, and 3) suits against individual state officers for prospective relief to end an ongoing violation of federal law.   MCI Tele. Corp, 271 F.3d at 503.

Here, Congress did not abrogate the States' sovereign immunity when it enacted § 1983. Quern v. Jordan, 440 U.S. 332, 345 (1979).  Additionally, the Commonwealth and the State Police have not consented to suit in federal court.   Finally, Plaintiffs are not asserting any prospective relief to end violations of any federal law.[15]   Therefore, Defendants Commonwealth and State Police are entitled to Eleventh Amendment Immunity and all claims against both Defendants will be dismissed.   This conclusion does not rely on the dashcam footage.

---

[14]   As noted, the claim in Count I has been withdrawn.

[15]   Although Plaintiffs seek injunctive relief on their claim under the Pennsylvania Equal Protection Clause, this claim is being dismissed for another reason.  See Section IV(C), infra.

### B. Plaintiff cannot establish a claim for malicious prosecution because Mr. Gillespie was detained prior to the issuance of any charges.[16]

Next, Mr. Gillespie by himself asserts a malicious prosecution claim in Count III against Defendant Johnson. (Doc. No. 1 at 40.) This claim can be resolved independently of the dashcam footage. To prove malicious prosecution under § 1983, a plaintiff must show:

> 1) the defendants initiated a criminal proceeding, 2) the criminal proceeding ended in plaintiff's favor, 3) the proceeding was initiated without probable cause, 4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and 5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

Kossler v. Crisanti, 564 F.3d 181, 186 (3d Cir. 2009)(citing Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003)). The fifth element of malicious prosecution claim requires there be a "deprivation of liberty consistent with the concept of seizure." Basile, 752 F.Supp.2d at 659 (quoting Kossler, 564 F.3d at 181). Thus,

---

[16] Plaintiffs' submit in their Response to the Motion to Dismiss that "Racial discrimination claims under Section 1981 and the Equal Protection Clause of the Fourteenth Amendment are the subject of Counts I, III, and IV of the Complaint." The Equal Protection Clause provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §1. Section 1981 provides that "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizen." 42 U.S.C. § 1981(a).

But Count I has been withdrawn by Plaintiffs and Counts III alleges a malicious prosecution claim and Count IV seeks a declaratory judgment and injunctive relief under the Equal Protection Clause of the Pennsylvania Constitution. (See Doc. No. 1 at 40-42.) Count III and IV do not raise claims under § 1981 or the federal Equal Protection Clause. These claims are not asserted in the Complaint and they need not be discussed further. But in any event, as noted infra, even if the Equal Protection claim under the United States Constitution is considered with the Equal Protection claim under the Pennsylvania Constitution, both fail to state a claim. The § 1981 claim fails too because this case does not involve a contract, and Plaintiffs have not been denied the other rights listed in § 1981.

> [t]he alleged seizure must occur as a result of the malicious prosecution, and thus, it must occur chronologically after the pressing of charges (citations omitted). The court of appeals has narrowed the applicable definition of seizure to when a criminal defendant is subject to either pretrial custody or 'some onerous type of pretrial, non-custodial restrictions.'

Id. (quoting DiBella, 407 F.3d at 603). Further,

> Attendance at hearings and other pre-trial proceedings has been held not to constitute a seizure within the meaning of the Fourth Amendment (citations omitted). Therefore, 'the type of constitutional injury the Fourth Amendment is intended to redress is the deprivation of liberty accompanying prosecution, not the prosecution itself.'

Id. (quoting DiBella, 407 F.3d at 603).

Defendants specifically challenge the third and fifth elements of the claim, stating that they had probable cause to issue the traffic citations (Doc. No. 2 at 16-19) and that "the burden of fighting the [traffic] violations in court do not give rise to a constitutional deprivation contemplated for a valid § 1983 claim." (Id. at 20.)[17]

Here, it is undisputed that Defendants initiated criminal proceedings against Mr. Gillespie and that the criminal proceedings ended in Mr. Gillespie's favor (both traffic citations were ultimately dismissed). (Doc. No. 1 at 22.) Moreover, Mr. Gillespie's arrest at the scene of the stop cannot be a basis for a malicious prosecution claim. His detention occurred prior to the issuance of the traffic citations and he was released. (Doc. No. 1 at 11, 19.) Thus, Mr. Gillespie's attendance at hearings for his traffic violations are the only "seizures" relevant to his malicious prosecution claim, but they are not "seizures" under the Fourth Amendment. Because Mr.

---

[17] Because the malicious prosecution claim is being resolved on the fifth element involving whether there was a seizure, there is no need to decide the probable cause element, which implicates the authenticity and verifiability of the dashcam video.

Gillespie has not alleged a proper malicious prosecution claim, the Motion to Dismiss Count III will be granted.

### C. The Pennsylvania Equal Protection claim against all Defendants will be Dismissed because Plaintiffs did not produce any comparators. [18]

In Count IV, Plaintiffs claim that Defendants have violated the Equal Protection Clause of the Pennsylvania Constitution ("Pennsylvania Equal Protection Clause") because, beginning in 2012, Defendants stopped "collecting racial data" and providing "ongoing training to proactively supervise its troopers." (Doc. No. 1 at 42.) Further, Plaintiffs claim that Defendants failed "to protect motorists that are African American and other persons of color (like Plaintiffs) traveling on state highways and other public roads from being racially profiled and discriminatorily surveilled, stopped, detained, searched and otherwise mistreated, without reasonable suspicion and solely because of their race." (Id.) They rely on the same allegations to support a claim under the Equal Protection Clause in the Fourteenth Amendment. Plaintiffs request both declaratory and injunctive relief for this conduct. [19] (Id.)

Article I, Section 26 of the Pennsylvania State Constitution provides that "[n]either the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of

---

[18]  Plaintiffs do not address the Pennsylvania Equal Protection Clause in their Response to Defendants' Motion to Dismiss (see Doc. No. 6 at 12–14), but they do attempt to add to this claim a violation of the Equal Protection Clause under the United States Constitution. Since the legal analysis is essentially the same for both the federal and state constitutional provisions, the Court will consider them as if both were alleged in Count IV.

[19]  At the hearing held on April 29, 2021, the Court asked for briefing on whether injunctive relief is available under the Pennsylvania Equal Protection Clause. It appears that the law is mixed. See Isaac v. Marsh, 2020 WL 6504637 (MD. Pa. Nov. 5, 2020) (holding injunctive relief is available under the Pennsylvania Constitution); see Sauers v. Lower Southampton Twp., 2016 WL 7319679 (E.D. Pa. Dec. 15, 2016)(same); but see Collins v. State, 2013 WL 5874770, at *3 (Pa. Cmwlth. Ct. 2013) ("The General Assembly has not waived immunity for equitable claims seeking affirmative action by way of injunctive relief.")

any civil right, nor discriminate against any person in the exercise of any civil right." The Pennsylvania Equal Protection claim asserted here is analyzed using the same standard that would apply to the Equal Protection claim under the Fourteenth Amendment.  Love v. Borough of Stroudsburg, 528 Pa. 320, 325 (1991) (citing James v. Southeastern Pennsylvania Transportation Authority, 505 Pa. 137, 144 (1984)).

Count IV alleges that Plaintiffs are asserting a selective enforcement claim under the Equal Protection Clause.  (See Doc. No. 1 at 42) ("Plaintiffs believe, and therefore allege, that other motorists, who are not African American or of color, have not been subjected to these racial profiling practices.") (See Doc. No. 6 at 13) ("The Equal Protection Clause also prohibits selective enforcement of the law based on consideration [sic] such as race.")

To establish a selective enforcement claim, a plaintiff must demonstrate 1) that he was treated differently from other similarly situated individuals, and 2) "that this selective treatment was based on an 'unjustifiable standard, such as race, or religion, or some other arbitrary factor, … or to prevent the exercise of a fundamental right."  Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Holder v. Allentown, 987 F.2d 188, 197 (3d Cir. 1993)).  A plaintiff must do more than illustrate an unequal application of a law or practice; he or she must also allege the existence of an "intentional or discriminatory purpose" motivating the unequal application.  PG Publ'g Co. v. Aichele, 705 F.3d 91, 115 (3d Cir. 2013) (citing Jewish Home of E. Pa. v. Ctrs. for Medicare & Medicaid Servs., 693 F.3d 359, 363 (3d Cir. 2011)).

A person is "similarly situated" when he or she is "alike in all relevant aspects" to another person or entity.  Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).  To meet the Equal Protection Clause's requisite standard, a plaintiff must do more than merely allege he or she was "similarly situated" to an individual or group treated differently.  PG Publ'g, 705 F.3d at 115.  A plaintiff must allege

specific facts, circumstances, or occurrences showing he or she was similarly situated to another specified person or entity and illustrate the alleged differential treatment that occurred.  Richardson v. Didok, No. 19-cv-5072, 2020 WL 5602526 (E.D. Pa. 2020) (citations omitted).

Here, in both the Complaint and the Response to the Motion to Dismiss, Plaintiffs have not alleged comparators with the degree of specificity required to sustain a selective enforcement claim under the Equal Protection Clauses.  In their Complaint, Plaintiffs merely state that they believe that motorists who are not people of color are not "subjected to these racial profiling practices." (Doc. No. 42.)  No comparators are identified in their Complaint or Response.  (See Doc. No. 6 at 13.)  Without sufficient comparators, a selective enforcement claim under the Equal Protection Clauses fails.  Consequently, Defendants' Motion to Dismiss Count IV will be granted.

### D. The Motion to Dismiss the negligent infliction of emotional distress claim will be granted because Plaintiffs do not assert any negligent action done by Trooper Johnson.

Finally, Plaintiffs allege negligent infliction of emotional distress (NIED) in Count VI against Trooper Johnson.[20]  A plaintiff must prove the following elements to sustain this claim.

> (1) the defendant was negligent; (2) the defendant's negligence placed the plaintiff in danger of physical impact or injury; and (3) the plaintiff suffered emotional distress as a result of defendant's negligent conduct

Pennsylvania Model J. Instructions § 13.40

This claim, however, has been modified to apply to four factual scenarios:

> (1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative.

---

[20]  Defendants Commonwealth and State Police are being dismissed as defendants because they are cloaked with Eleventh Amendment immunity. Thus, there is no need to refer to them as Defendants in Count VI.

<u>Daly v. New Century Trans., Inc.</u>, 2012 WL 4060687 at *7 (M.D. Pa. 2012) (citing <u>Toney v.</u> <u>Chester County Hosp.</u>, 961 A.2d 192, 197–98 (Pa.Super.Ct.2008)).

Here, as a threshold matter, although Plaintiffs allege in the Complaint reliance on all four theories, they do not allege any negligent action on the part of Defendants.  On the contrary, the Complaint only asserts intentional conduct.  By way of example, Plaintiffs allege the following:

1. "Plaintiffs, to wit, have suffered multiple indignities by and through Defendants' actions – actions that were not fully captured on Defendants' (Trooper Johnson's) body camera by intentional acts to coverup their wrongdoing."  (Doc. No. 1 at 4-5.)

2. Trooper Johnson intentionally surveilled Plaintiffs for more than two miles.  (<u>Id.</u> at 33.)

3. Trooper Johnson's conduct was intentional and motived by evil motive or intent.  (<u>Id.</u> at 38.)

Other than bare legal conclusions, the Complaint does not allege any negligence on the part of Trooper Johnson.[21]  (<u>See</u> <u>id.</u> at 45-47.)  Therefore, the Motion to Dismiss Count VI will be granted.

### E.  The dashcam footage cannot be considered at the Motion to Dismiss stage.

When addressing the remaining claims, there is a threshold issue of whether the dashcam footage can be considered in resolving the Motion to Dismiss.  The police dashcam footage was originally referenced in the Complaint and attached to the Motion to Dismiss.  (<u>See</u> Doc. No. 1 at 23) (<u>See also</u> Doc. No. 2 Exhibit A).  In the Complaint, the allegation was as follows: "On September 20, 2019… the Defendant Police published for "IMMEDIATE RELEASE" with what it claimed was a "*full, unedited video of the encounter.*"  (<u>See</u> Doc. No. 1 at 23) (emphasis in

---

[21]   Federal Rule of Civil Procedure 8(d)(3) permits inconsistent claims such as ones that allege intentional or negligent conduct.  But here, no negligent conduct is alleged in the Complaint necessary to sustain the NIED claim.

original).   Thereafter, Plaintiff filed as supplemental brief challenging the authenticity of the dashcam video. (See Doc. No. 16.-1 at 2.)  The essence of Plaintiffs' concerns is that portions of the video are edited.  (See id. at 2.)

In response, Defendants' submit that in a case such as this one, where there is videotape evidence of critical events, the Court should consider the videotape when determining whether to accept Plaintiffs' allegations.[22]  (See Doc. No. 2 at 10.)   Defendants rely Scott v. Harris, 550 U.S. 372 (2007).

In Scott, a motorist brought a § 1983 claim against a police officer for excessive force.  550 U.S. at 374.  The district court depicted the driver as "cautious and controlled," while videotape footage showed "what … more closely resembles[d] a Hollywood-style car chase."  (Id. at 379-80.)  The Supreme Court noted that when a reliable video depicts the events in question, courts must not adopt a version of the facts that is "blatantly contradicted" by video footage.  (Id. at 380.) See also Jacobs v. Cumberland County, 8 F.4th 187, 192 (3d Cir. 2021).

Scott, however, is distinguishable from the instant case.  Here, Plaintiffs have submitted an expert report to contest the authenticity of the dashcam footage.  (See Doc. No. 16-1.)  In Scott, there were "no allegations or indications that this videotape was doctored or altered in anyway." 550 U.S. at 378.  Scott was also decided on a Motion for Summary Judgment, rather than a Motion to Dismiss.  Id. at 376.  Therefore, Scott is not controlling in deciding this Motion.

The Third Circuit has explained that when a defendant attaches an undisputedly authentic, integral document to its motion to dismiss, it may be properly considered if the plaintiff is afforded the opportunity to respond.  O'Neill v. Chester Downs & Marina, LLC, 2015 WL 5240045 (citing

---

[22]  In the Motion, Plaintiffs claim that the video is inauthentic because it is edited.  In the response, Defendants further argue that the video is authentic and reliable and that Plaintiffs' expert report is unreliable and should not be considered by the Court.  (Doc. No. 17 at 2)

Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.3d 1192, 1196 (3d Cir. 1993)).  For

a document to qualify under the rule, however, it must be a document "whose authenticity no party

questions," that is "referred to in the plaintiff's complaint" and is "central to plaintiff's claim."

Pryor v. Nat'l Collegiate Athletic Ass'n., 288 F.3d 548, 560 (3d Cir. 2002).

Here, the dashcam footage of the traffic stop does not meet these requirements.  Plaintiffs

challenge the authenticity of the footage after obtaining an expert report that noted several

discrepancies in the footage.  (Doc. No. 16 at 6.)   And while the video was referenced in the

Complaint, Plaintiffs do contest its authenticity.  (Doc. No. 1 at 22) ("… a dashcam video of the

Stop that had obvious, unexplained omitted audio gaps and which Mr. and Mrs. Gillespie also

believed were edited.")  The dashcam footage and evidence about its authenticity and verifiability

thus cannot be considered without converting the Motion to Dismiss into a Motion for Summary

Judgment.  In Re Rockefeller Ctr. Props., Inc. Sec. Litig., 184 F.3d 280, 287 (3d Cir. 1999).

Therefore, pursuant to Federal Rule of Civil Procedure 12(d), the Motion to Dismiss counts

containing claims that implicate the dashcam footage will be converted into a Motion for Summary

Judgment.

### F.  The Motion to Dismiss Count II of the Complaint for false imprisonment will be converted into a Motion for Summary Judgment because it relies on the dashcam recording.

In Count II of the Complaint, Plaintiffs allege a False Imprisonment claim against Trooper

Johnson.  Plaintiffs submit that they were falsely imprisoned because Defendant Johnson did not

have reasonable suspicion to follow their SUV and did not have a lawful reason to detain them.

(Doc. No. 1 at 38.)   A false imprisonment claim under § 1983 is "grounded in the Fourth

Amendment guarantee against unreasonable seizures."  Groman v. Twp. of Manalapan, 47 F.3d

628, 636 (3d Cir. 1995).  To make out a claim for false imprisonment, "a plaintiff must show that

the arresting officer lacked probable cause to make the arrest." <u>Garcia v. County of Bucks</u>, 155 F.Supp.2d 259, 265 (E.D. Pa. 2001).[23]  "Probable cause exists when the totality of the facts and circumstances are sufficient to warrant an ordinary prudent officer to believe that the party charged has committed the offense." <u>Id.</u>

According to the Complaint and Motion to Dismiss, Trooper Johnson initially activated his emergency lights because he saw Mr. Gillespie cross over the double yellow line.  (<u>See</u> Doc. No. 2-1 at 2.)  Whether Mr. Gillespie did in fact commit this traffic violations depends on the use of the dashcam footage.  If Mr. Gillespie did not commit a traffic offense, there may have been no probable cause to stop and detain him.  Therefore, the Motion to Dismiss Count II of the Complaint will be treated as a Motion for Summary Judgment.

### G. The dashcam footage must be considered in order to determine whether Trooper Johnson is entitled to qualified immunity.

Defendant Johnson contends that he is entitled to qualified immunity on Plaintiffs' § 1983 claims for false imprisonment (Count II) and malicious prosecution (Count III),[24] the only federal claims asserted against him personally.  Both claims are premised on a violation of the Fourth Amendment to the United States Constitution.  (Doc. No. 2 at 22.)

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).   A two-prong test is used to

---

[23]  False imprisonment and false arrest are often used interchangeably.  <u>See, e.g</u>, <u>Kokinda v. Breiner</u>, 557 F.Supp.2d 581, 582 (M.D. Pa. 2008)("A claim under § 1983 for false arrest/false imprisonment is grounded in the Fourth Amendment guarantee against unreasonable seizure.")

[24]  As noted in Section B, the malicious prosecution claim is being dismissed for a reason unrelated to the dashcam footage.

determine whether an officer is entitled to qualified immunity: "(1) whether the officer violated a constitutional right, and (2) whether the right was clearly established, such that 'it would [have been] clear to a reasonable officer that his conduct was unlawful." El v. City of Pittsburgh, 975 F.3d 327, 334 (3d 2020) (quoting Lamont v. New Jersey, 637 F.3d 177, 182 (3d Cir. 2011)).

As the United States Supreme Court has explained:

> A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Reichle v. Howards, 566 U.S. 658, 664 (2012). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al–Kidd, 563 U.S. 731, 741 (2011).

Mullenix v. Luna, 577 U.S. 7, 11-12 (2015). In determining whether a right was clearly established, courts look to analogous Supreme Court precedent, as well as other binding appellate opinions. Fields v. City of Phila., 862 F.3d 353, 361 (3d Cir. 2017).

The Motion to Dismiss asserts that Trooper Johnson temporarily detained Mr. Gillespie because the SUV crossed over the double yellow line in the center of Webb Road and he did not immediately pull over after the police lights were activated. (Doc. No. 6 at 2.) Neither of these facts are conceded in the Complaint.[25] Thus, in order to determine whether Mr. Gillespie committed traffic offenses in front of Trooper Johnson, the dashcam footage must be considered. The dashcam footage also will shed light on the reasonableness of Trooper Johnson's conduct in detaining Plaintiffs. Therefore, whether to grant Trooper Johnson qualified immunity will be decided at the Summary Judgment stage.

---

[25] Plaintiffs submit that Mr. Gillespie was merely looking for a safe place to pull over. (See Doc. No. 1 at 3.)

**H. The Motion to Dismiss the Intentional Infliction of Emotional Distress claim will be converted into a Motion for Summary Judgment.**

In Count V, Plaintiffs assert a claim for Intentional Infliction of Emotional Distress (IIED) against Trooper Johnson.  (Doc. No. 1 at 44.)  A claim for IIED requires the plaintiff to plead facts showing that: 1) the conduct at issue was extreme and outrageous; 2) the conduct was done intentionally or recklessly; 3) the conduct caused emotional distress; and 4) the resultant distress was severe." D.C. v Pittsburgh Public Schools, 415 F.Supp.3d 636, 665 (W.D. Pa 2019). "Outrageous conduct is that which is so atrocious and utterly intolerable that it goes beyond all possible bounds of decency in a civilized society." Alers v. City of Philadelphia, 919 F.Supp.2d 528, 561 (E.D. Pa 2013) (citing McGreevy v. Stroup, 413 F.3d 359, 371 (3d Cir. 2005)).

The Court has the initial task of determining whether the conduct at issue is "sufficiently extreme to constitute 'outrageousness' as a matter of law." D.C., 415 F.Supp.3d 636 at 665 (quoting Martin-Mcfarlane v. City of Phila., 299 F. Supp. 3d 658, 671 (E.D. Pa 2017)). [26]   Here, Trooper Johnson's conduct and whether it met the requisite level of "outrageousness" can only be determined in conjunction with a decision on the dashcam footage.  Consequently, the Motion to Dismiss Count V of the Complaint will be treated as a Motion for Summary Judgment.

---

[26]   The following have been deemed "extreme and outrageous":

1) Killing the plaintiff's son with an automobile and then burying the body, rather than reporting the incident to the police;
2) Intentionally fabricating documents that led to the plaintiff's arrest for murder; and
3) Knowingly releasing to the press false medical records diagnosing the plaintiff with a fatal disease.

Hoy v. Angelone, 554 Pa. 134, 151 (1998).

**I.   Whether Trooper Johnson is entitled to sovereign immunity will be decided at the Summary Judgment stage.**

Finally, Defendant Johnson asserts that he is entitled to sovereign immunity under Pennsylvania for the claims in Counts V (Intentional Infliction of Emotional Distress) and VI (Negligent Infliction of Emotional Distress).[27]   In response, Plaintiffs argue that Defendant Johnson was acting outside the scope of his employment because he engaged in racial profiling. (Doc. No. 6 at 16-17.)   Further, Plaintiffs assert that "Courts have held that where the use of force by a police officer is attenuated from any imminent threat to safety, and not incident to an arrest, it does not fall within the scope of employment." Id. at 16.

Courts look to state law to determine the scope of sovereign immunity.   Lombardo v. Pennsylvania, Dep't of Pub. Welfare, 540 F.3d 190, 195 (3d Cir. 2008).  The doctrine of sovereign immunity bars claims against "a Commonwealth agency and any employee thereof, but only with respect to an act within the scope of his office or employment." 42 Pa. C. S. § 8501.  Hence, there are two ways to defeat sovereign immunity: 1) waiver by the legislature or 2) showing that an official was acting outside the scope of his employment.

Section 228 of the Restatement, adopted in Pennsylvania, provides:

Conduct of [an employee] is within the scope of employment if, but only if:

(a) It is of the kind he is employed to perform;
(b) It occurs substantially within the authorized time and space limits;
(c) It is actuated, at least in part, by a purpose to serve the [employer], and
(d) If force is intentionally used by the [employee] against another, the use of force is not unexpectable by the [employer].

---

[27]   As stated above, the claim for NIED will be dismissed on the grounds that Plaintiffs do not allege any negligent conduct.

Justice v. Lombardo, 652 Pa. 588, 604 (citing Restatement (Second) of Agency § 228(1) (1958)).

The Pennsylvania Supreme Court has long held that whether a particular act is within the scope of

employment is a question of fact for the jury.  Id. at 606 (citations omitted).  The one exception is

"where neither the facts nor the inferences to be drawn from them are in dispute."  Id.

      Whether Trooper Johnson was acting within the scope of his employment depends on what

is depicted in the dashcam footage.  If Trooper Johnson did not have a legitimate reason to stop

the SUV, he would not be acting within the scope of his employment.  See Burlington Industries,

Inc. v. Ellerth, 524 U.S. 742, 757 (1998) (committing a tort while "[a]cting purely from personal

ill will" is not within the scope of employment.")   Therefore, whether Trooper Johnson is entitled

to sovereign immunity will be determined on a Motion for Summary Judgment.

## V.   CONCLUSION

      Based on the foregoing, Defendants' Motion to Dismiss will be granted in part.  In addition,

in part, the Motion will be treated as one for Summary Judgment.  Thus, in accordance with this

Opinion:

1. Defendants' Motion to Dismiss (Doc. No. 2) alleging a violation of Title VI of the Civil Rights Act is **GRANTED.**

2. Defendants' Motion to Dismiss (Doc. No. 2) all claims against Defendant Commonwealth of Pennsylvania and Pennsylvania State Police is **GRANTED.**

3. Defendants' Motion to Dismiss (Doc. No. 2) the malicious prosecution claim against Defendant Johnson is **GRANTED.**

4. Defendants' Motion to Dismiss (Doc. No. 2) the Equal Protection Claims is **GRANTED.**

5. Defendants' Motion to Dismiss (Doc. No. 2) the Negligent Infliction of Emotional Distress claim is **GRANTED.**

6. The Motion to Dismiss Count I alleging False Imprisonment by Trooper Johnson will be treated as one for Summary Judgment.

7. The Motion to Dismiss the Intentional Infliction of Emotional Distress claim against Trooper Johnson will be converted into a Motion for Summary Judgment.

8. All immunities claims asserted by Trooper Johnson will decided at the Summary Judgment stage.

9. Parties will be given time to do discovery on the Motion for Summary Judgment. Discovery shall be completed by **March 4, 2022.**

10. A hearing on the reliability and verifiability of the dashcam footage will be held on **Thursday, March 11, 2022 at 10:00 A.M.** in in Courtroom 13A, United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania.

11. All supplemental Motions for Summary Judgment and supporting memoranda shall be filed no later than **March 24, 2022,** and responses to any such motions shall be filed no later than **April 21, 2022**.  Motions for summary judgment and responses shall be filed in the form prescribed in Judge Slomsky's Scheduling and Motion Policies and Procedures, a copy of which can be found at www.paed.uscourts.gov.

An appropriate Order follows.